IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

JAVIER FRANCISCO VILLANUEVA-RIOS,
RICARDO VILLANUEVA-RIOS,
ABRAHAM NEFTALI GONZALEZ-ESPINO,
and FREDERICK LEON GANT III,

      Defendants.

CRIMINAL ACTION NO.

1:20-cr-73-MHC-CMS

## FINAL REPORT AND RECOMMENDATION

This case is before the Court on the motions to suppress filed by Frederick

Leon Gant III ("Gant"), Abraham Neftali Gonzalez-Espino ("Gonzalez"), and Javier

Francisco Villanueva-Rios ("J. Villanueva") (collectively "Defendants").  [Docs.

80, 83, 86].  In their motions, Defendants move to suppress certain wiretap evidence

that was captured from three phones allegedly used by J. Villanueva between March

and December 2019.[1]

---

[1] A fourth defendant, Ricardo Villanueva-Rios ("R. Villanueva") also filed a motion
to suppress, but it was denied as moot after he advised the Court that he would be
entering a guilty plea.  [Docs. 82, 140].  R. Villanueva pled guilty on March 17,
2021.  [Doc. 143].

## I.   FACTUAL BACKGROUND

### A.   The First Application (Target Telephone #1)

On September 10, 2019, Assistant United States Attorney Scott McAfee ("AUSA McAfee") applied for a Title III intercept order for the phone assigned phone number 678-830-6838, referred to herein as Target Telephone #1 or TT#1 ("First Application").  [Doc. 92 at 1–14].  The First Application stated that TT#1 was subscribed in the name of Pedro Ortiz but was believed to be used by "Acosta," who McAfee described as "a drug dealer and courier operating in and around the Atlanta area."  [*Id.* at 2].  The First Application contained two attachments:  a United States Department of Justice memo ("DOJ memo"), letter, and order collectively authorizing AUSA McAfee to make the application[2] [*id.* at 16–20]; and an affidavit signed by Brandon Thompson, a Task Force Officer with the Atlanta Field Division Office of the Drug Enforcement Administration ("TFO Thompson"), dated September 10, 2020 ("First Thompson Aff.") [Doc. 92 at 22–63].

---

[2] The wiretap applications in this case were accompanied by Attorney General Order No. 4417-2019, signed March 25, 2019.  [Doc. 92 at 20; Doc. 92-2 at 22; Doc. 92-4 at 19].  The Order invoked [18 U.S.C.] § 2516(1) and specially designated any Deputy Assistant Attorney General ("DAAG") and any acting DAAG of the Criminal Division. Each application also contained a unique authorization memorandum signed by the DAAG or acting DAAG.  [Doc. 92 at 16–19; Doc. 92-2 at 18–21; Doc. 92-4 at 21–24].  The authorization memorandum, Attorney General Order No. 4417-2019, and the authorizing DAAG or acting DAAG were all identified in each application and order.

In his affidavit, TFO Thompson identified three specific target suspects—"Acosta," "Edgar," and defendant Gonzalez—along with "[o]thers yet to be identified."[3]  [First Thompson Aff. ¶ 7].  The affidavit listed several target offenses, including conspiracy to possess with intent to distribute controlled substances and money laundering.  [*Id.* ¶ 8].  In the probable cause portion of his affidavit, TFO Thompson stated that in March 2019, a DEA confidential source informed federal agents that an individual known as "Acosta" was distributing large amounts of heroin in the metro Atlanta area through a Mexican drug-trafficking organization.  [*Id.* ¶ 20].  He stated that the agents used the confidential source to conduct multiple controlled purchases of heroin from "Acosta" during the summer of 2019.  [*Id.* ¶¶ 21–57].  According to the affidavit, "Acosta" changed phones repeatedly during that time period and began using TT#1 to conduct his drug business on August 29, 2019.  [*Id.* ¶¶ 22, 23, 34, 45, 49, 59–60].

The affidavit contained a section titled "Need for the Interceptions," in which TFO Thompson detailed the use of traditional investigative techniques.  [First Thompson Aff. ¶¶ 62–90].  For example, he explained that although the confidential source had been valuable for making controlled purchases, the confidential source

---

[3] Due to the use of multiple aliases, agents could not confirm the identity of J. Villanueva and R. Villanueva at the time of the application for TT#1.  According to the Government, "Acosta" turned out to be J. Villanueva and "Edgar" turned out to be R. Villanueva.  [Doc. 91 at 6].

had not learned anything about the source of supply, where "Acosta" stored his drugs, or how "Acosta" laundered the proceeds. [*Id.* ¶ 64]. He explained that an undercover agent was working on the case and had been present at some of the controlled buys, but he stated that the agent had not had any direct communication with the targets and was likely to be viewed only as a drug customer. [*Id.* ¶ 65]. TFO Thompson discussed how the agents had used physical surveillance, including surveillance initiated by consensually-recorded conversations between the confidential source and "Acosta," but stated that "Acosta" often conducted counter-surveillance maneuvers, and that long-term surveillance (including the use of pole cameras) of the place where they suspected "Acosta" lived was not appropriate due to the location. [*Id.* ¶¶ 67–69, 75]. According to TFO Thompson, law enforcement had used geo-location phone data and had installed a tracker on the car "Acosta" drove, but the location information obtained from these techniques was not always precise. [*Id.* ¶¶ 76–77]. TFO Thompson averred:

> While surveillance has been useful in this investigation, physical surveillance will not alleviate the need for interceptions because of the general limitations of simple physical surveillance. For example, the surveillance to date has not produced substantial evidence to identify all of ACOSTA's conspirators, sources of supply, customers, and/or means of distribution of the drug trafficking proceeds. And, as discussed herein, while physical surveillance has identified residences and locations during this investigation, agents have not learned the relationship, if any, between those locations and ACOSTA, GONZALEZ, EDGAR, or their conspirator's [sic] drug trafficking activities. Based upon surveillance alone, agents will not understand

the context or purpose or the full significance of the location under observation.

[*Id.* ¶ 78].   TFO Thompson also discussed how the agents had used consensual recordings of calls between the confidential source and "Acosta," had obtained toll information from subpoenas and pen registers for telephones identified in the investigation, and had conducted trash pulls.  [*Id.* ¶¶ 81–86].

TFO Thompson discussed the reasons why certain other traditional techniques had not yet been employed.  For example, he stated that agents had not conducted any searches of the house where "Acosta" was believed to reside or another residence where drug activity had occurred because such a search would be "counterproductive to the ultimate goals of the investigation." [First Thompson Aff. ¶ 79].   TFO Thompson averred that before such searches could be conducted, wiretap evidence was needed to provide supporting evidence so that the agents could "effectively choose which persons, places, or things" needed to be searched and when those searches should be conducted.  [*Id.* ¶ 80].  Moreover, the early execution of search warrants at these residences could have effectively destroyed any chance the agents had at identifying and prosecuting other members of the conspiracy.  [*Id.*].  With respect to grand jury subpoenas (another traditional law enforcement tool that the agents had not used in the investigation), TFO Thompson explained:

> that the use of grand jury subpoenas to call witnesses would not be successful in achieving the goals of this investigation because: (a) any target subjects called to testify would most likely be uncooperative

5

and/or invoke their Fifth Amendment privilege; (b) it would be unwise to seek grand jury immunity for any of these subjects, as it might foreclose prosecution of the most culpable participants in the network and compromise the investigation; (c) any grand jury inquiries at this time would likely drive the operation further underground and thus lead to the destruction of key records and evidence and flight of the network's members from the Atlanta area and elsewhere.

[*Id.* ¶ 87].  With regard to their attempts to track the proceeds, TFO Thompson stated that the agents had not yet learned of any bank or financial institution that the targets had used, noting that uncovering financial evidence was particularly difficult because they had not yet determined the true identities of the targets.  [*Id.* ¶¶ 89–90].

On September 10, 2019, United States District Judge Steve C. Jones approved the request and signed an Order Authorizing Original Interception of Wire and Electronic Communications Over Target Telephone #1 ("First Intercept Order"). [Doc. 92-1].

## B.    The Second Application (Target Telephone #2)

The following month, on October 15, 2019, AUSA McAfee applied for another Title III intercept order, this time seeking authorization to tap the phone assigned phone number 678-949-3885, referred to herein as Target Telephone #2 or TT#2 ("Second Application").  [Doc. 92-2 at 1–16].  The Second Application stated that TT#2 was subscribed in the name of Marcus Sims but was believed to be used by J. Villanueva.  [*Id.* at 6].  AUSA McAfee described J. Villanueva as "a drug dealer and courier operating in and around the Atlanta area."  [*Id.* at 2].  Like the First

Application, the Second Application contained two attachments: the DOJ memo, letter, and order [*id.* at 18–23], and a supporting affidavit from TFO Thompson ("Second Thompson Aff.") [Doc. 92-2 at 25–71].

In his affidavit, TFO Thompson identified eleven target suspects, including J. Villanueva, who TFO Thompson alleged was the same person he had referred to as "Acosta" in the First Application. [Second Thompson Aff. ¶¶ 7, 26]. Like his previous affidavit, TFO Thompson stated that there were other targets "yet to be identified." [*Id.* ¶ 7]. The affidavit related much of the same probable cause information as the first affidavit [*id.* ¶¶ 20–21], and provided additional details about events that occurred after the first wiretap was initiated, including the repeated use of TT#1 in drug related activities. [*Id.* ¶¶ 22–35]. According to TFO Thompson, on September 25, 2019, J. Villanueva contacted the confidential source from a new phone, TT#2, and used TT#2 to coordinate a 250-gram heroin transaction with the confidential source. [*Id.* ¶¶ 37, 39–48]. J. Villanueva stopped actively using TT#1 on September 27, and the DEA stopped monitoring TT#1 on October 4. [*Id.* ¶ 38].

Like the first, affidavit, TFO Thompson's second affidavit contained a section titled "Need for the Interceptions," in which he detailed the use of traditional investigative techniques. [Second Thompson Aff. ¶¶ 50–86]. TFO Thompson asserted that a wiretap of TT#2 was necessary to identify J. Villanueva's co-conspirators and to learn more about local drug trafficking operations and finances.

[*Id.* ¶ 51].  The affidavit detailed how the investigation had used certain traditional investigative techniques (e.g., confidential sources/undercover agents, surveillance, consensual recordings, pen registers and toll records, trash pulls, and financial investigations) [*id.* ¶¶ 52–71, 74–79, 82–85], and explained why other techniques (e.g., search warrants and consent searches and grand jury interviews) had not been used [*id.* ¶¶ 72–73,  80–81].  With respect to the evidence obtained from the wiretap of TT#1, TFO Thompson stated that even after the agents began tapping J. Villanueva's phone, the agents were still not able to fully identify all of his conspirators, including his supplier of heroin.  [*Id.* ¶ 86].  In addition, he stated that the prior interception did not reveal the location of a "stash house," or location where J. Villanueva regularly stored his inventory of controlled substances.  [*Id.*].

On October 15, 2019, United States District Judge Leigh Martin May approved the application and signed an Order Authorizing Original Interception of Wire and Electronic Communications Over Target Telephone #2.  [Doc. 92-3 at 1–14].

## C.    The Third Application (Target Telephone #3)

Approximately five weeks later, on November 22, 2019, AUSA McAfee applied for yet another Title III intercept order, this time seeking authorization to tap the phone assigned phone number 770-899-9717, referred to herein as Target Telephone #3 or TT#3 ("Third Application").  [Doc. 92-4 at 1–17].  The Third

Application stated that TT#3 was subscribed in the name of Rodrigo Cortez but was believed to be used by J. Villanueva. [*Id.* at 6]. AUSA McAfee described J. Villanueva as "a drug dealer and courier operating in and around the Atlanta area." [*Id.* at 2]. Like the First and Second Applications, the Third Application contained two attachments: the DOJ memo, letter, and order [*id.* at 19–24], and a supporting affidavit from TFO Thompson ("Third Thompson Aff.") [Doc. 92-4 at 26–75].

In his third affidavit, TFO Thompson identified eighteen target suspects, including the four defendants in this case—J. Villanueva, Gonzalez, R. Villanueva, and Gant—and stated that there were additional targets "yet to be identified." [Third Thompson Aff. ¶ 7]. The affidavit related much of the same probable cause information as the earlier affidavits [*id.* ¶¶ 20–21], but provided additional information about events that occurred after the two earlier wiretaps were initiated, including the repeated use of TT#2 in drug-related activities. [*Id.* ¶¶ 22–46]. For example, on October 26, the DEA used the TT#2 authorization, along with other investigative techniques, to monitor a one-kilogram heroin transaction between defendants R. Villanueva, J. Villanueva, Gonzalez, and Gant. [*Id.* ¶¶ 31–46]. Gant was stopped and arrested after the conclusion of this transaction and charged with trafficking heroin and possession of a firearm during the commission of a crime. [*Id.* ¶ 45].

According to TFO Thompson, on October 29, 2019, J. Villanueva contacted the confidential source from a new phone, TT#3. [Third Thompson Aff. ¶ 48]. He stopped actively using TT#2 on October 28, 2019, and the DEA stopped monitoring TT#2 on October 30, 2019. [*Id.* ¶ 38]. The DEA analyzed toll data for TT#2 and TT#3 and determined that both phone numbers were used to make many of the same contacts, concluding that TT#3 was likely a replacement for TT#2. [*Id.* ¶¶ 47–50].

Like the other affidavits, TFO Thompson's third affidavit contained a section titled "Need for the Interceptions" [Third Thompson Aff. ¶¶ 51–91] that included the same reasons as previously stated for the wiretap of TT#2[4] [*id.* ¶ 52]. And, once again, the application described the investigative techniques the DEA used from June until the time of the Third Application, explained how these techniques had been insufficient to collect the necessary information, and explained why certain other investigative techniques had not been used. [*Id.* ¶¶ 51–91]. TFO Thompson stated that despite the evidence obtained from the interception of TT#1 and TT#2, the goals of the investigation still had not been met: the agents still had not identified J. Villanueva's heroin supplier, nor had they uncovered the location of a stash house or other locations where J. Villanueva stored his drug inventory. [*Id.* ¶ 91].

---

[4] The affidavit in support of the Third Application retains the exact same typographical error as the affidavits in support of applications for wiretaps on TT#1 and TT#2, labeling five reasons necessary for a wiretap sequentially as *a*, *b*, *c*, *d*, and *f*. [Doc. 92 at 46; Doc. 92-2 at 49; Doc. 92-4 at 51]. The repetitive nature of the Government's applications is the basis of one of the Defendants' arguments.

On November 21, 2019, United States District Judge Amy Totenberg approved the application and signed an Order Authorizing Original Interception of Wire and Electronic Communications Over Target Telephone #3. [Doc. 92-5 at 1–14].

On February 11, 2020, a federal grand jury in this district returned an eleven-count First Superseding Indictment against Defendants, charging them with drug-related crimes including conspiracy to possess with intent to distribute heroin. [Doc. 99].

## II.    LEGAL FRAMEWORK[5]

The Government's ability to intercept communications is governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 ("Title III"). This statutory framework contains detailed requirements for both a wiretap application and judicial authorization order. One of those requirements is that a wiretap application must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they

---

[5] J. Villanueva moves to suppress the evidence collected from TT#1, TT#2, and TT#3. [Doc. 86 at 1–2]. Gonzalez moves to suppress the evidence collected from TT#1 [Doc. 80 at 1–2], and Gant moves to suppress the evidence collected from TT#3 [Doc. 83 at 1]. The Government agrees that the Defendants have standing to challenge the particular wiretap orders listed in their respective motions. [Doc. 91 at 2]. I have assumed, for purposes of this Report and Recommendation that each has standing with respect to the particular wiretap orders listed in their respective motions.

reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Based on the application, a district court may authorize a wiretap order if it agrees that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(3)(c). These provisions make up the "necessity requirement," which is meant to ensure that electronic surveillance is neither routinely used nor used when less intrusive techniques will suffice. *See United States v. Giordano*, 416 U.S. 505, 514–15 (1974); *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).

The application for the wiretap authorization must "show with specificity why in *this particular investigation* ordinary means of investigation will fail." *United States v. Carrazana*, 921 F.2d 1557, 1565 (11th Cir. 1991) (quoting *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985) (emphasis in original)). The application "need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves." *See United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986). Whether such investigative techniques have been a success or a failure depends on the government's objectives. *See United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011) ("The partial success of alternative investigative measures, however, does not necessarily render

12

electronic surveillance unnecessary."); *United States v. Allen*, 274 F. App'x 811, 816 (11th Cir. 2008) (unpublished) ("[T]he government's ultimate objective and the traditional methods' usefulness to that objective are important to the necessity inquiry.") (citing *Van Horn*, 789 F.2d at 1497).

The "district court is clothed with broad discretion" when considering a Title III wiretap application. *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984). Title III provides for the suppression of any evidence that is obtained in violation of the statute. 18 U.S.C. § 2515. A criminal defendant may move for suppression of wiretap evidence on the grounds that (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval. 18 U.S.C. § 2518(10)(a).

In their motions, Defendants argue that the Government failed to satisfy the necessity requirement. J. Villanueva makes an additional argument that the Government did not have the statutory authority to apply for the wiretap orders because the Attorney General did not specially designate the approving deputy assistant attorneys general by name or limit their designation by time. I will address these arguments in turn.

## III.   DISCUSSION

### A.   The Government showed that the three wiretaps were necessary.

Defendants first argue that the Title III applications failed to establish the legal necessity required by 18 U.S.C. § 2518.   They point to the various conventional investigative techniques that law enforcement employed (i.e., confidential sources, physical surveillance, controlled purchases, consensual recordings, trash pulls, pen registers, toll records, GPS tracking, and geo-location data), and they note that each technique produced some evidence against them.   [Doc. 80 at 3–4; Doc. 83 at 3; Doc. 86 at 8–12].   For example, Gonzalez states:

> Here, the government had an active informant who was able to record conversations with the targets, including Gonzalez, leading up to the drug buys.   The informant's controlled purchases were monitored in real time by multiple agents.   The informant was debriefed immediately upon the completion of each purchase as to who was involved, what was said and what was seen. Agents further observed the targets at their residences.   A trash pull recovered packaging consistent with narcotic sales.   The vehicles used by the targets were registered to Gonzalez.   A tracker was place[d] on one of his vehicles.   All in all, a strong evidentiary case was developed without resorting to a Title III wiretap.

[Doc. 80 at 6].   In a similar vein, J. Villanueva claims that the techniques described in the supporting affidavits were successful in building "a formidable case" against him and several others before the agents ever even applied for the first wiretap. [Doc. 86 at 13].   Thus, Defendants argue that there was no need to tap the phones because "traditional investigative techniques [were sufficient] to expose the crime." [Doc. 80 at 3 (quoting *Kahn*, 415 U.S. at 453 n.12)].   In making this argument,

Defendants take too narrow a view of the scope of the Government's investigation as set forth in the Title III wiretap applications.

According to the affidavits supporting the applications, the primary targets of the first wiretap application for TT#1 were three of the four Defendants, along with "[o]thers yet to be identified." [First Thompson Aff. ¶ 7]. Also listed as investigative objectives are, inter alia, "[t]he identities and roles of accomplices, aiders and abettors, conspirators, and other participants in their illegal activity, including sources of supply for the narcotics." [*Id.* ¶ 11]. Judge Jones authorized the wiretap to pursue these targets and objectives. [Doc. 92-1 at 1–3]. Similarly, the affidavits in support of the wiretaps on TT#2 and TT#3 list the same three people as targets [Doc. 92-2 at 27–29; Doc. 92-4 at 28–30], but also include numerous other targets, including potential brokers and suppliers to Defendants. United States district judges authorized interceptions of TT#2 and TT#3 based on the targets and the objectives affirmed in those applications. [Doc. 92-3 at 1–3, 5; Doc. 92-5 at 1–4, 5–6]. Therefore, even if conventional investigative techniques were sufficient to expose the crimes of the four individuals charged in this particular case, the Government nevertheless was authorized by statute to apply for wiretap authorizations in pursuit of other targets and objectives.

J. Villanueva argues that the Government's affidavits show no more than a buyer-seller relationship between one person and a source of supply in Mexico, and

that such a relationship is not a criminal conspiracy under *United States v. Dekle*, 165 F.3d 826 (11th Cir. 1999).   Therefore, he concludes that the Government's purported goal of identifying J. Villanueva's supplier was really an unnecessary expansion of the investigation used to justify an unending dragnet of interconnected wiretap applications, limited only by law enforcement resources.   [Doc. 96 at 3–5]. *Dekle*, however, does not support this position.   That case held that there was no conspiracy where the buyer and seller "understood their transactions to do no more than support the buyer's personal drug habit . . . ." *Dekle*, 165 F.3d at 829–30.   Here, in contrast, the Government was conducting a months-long investigation trying to uncover the source of supply for J. Villanueva's multiple-kilogram heroin transactions.   Unlike the situation in *Dekle*, the transactions between J. Villanueva and his source of supply cannot be understood as simply supporting Villanueva's personal drug habits; any transactions between them were fairly investigated as an agreement between J. Villanueva and his source to commit a distribution crime beyond the sales agreement itself.   Furthermore, the Government's applications were limited to three phone numbers that all belonged to a single person (J. Villanueva), and did not amount to an "unending series of wiretaps . . . ensnaring the innocent communications of an exponentially increasing number of people."   [Doc. 86 at 17]. Instead, "it is unrealistic to require the termination of an investigation before the entire scope of the [conspiracy] is uncovered and the identity of its participants

learned." *United States v. Perez*, 661 F.3d 568, 582 (11th Cir. 2011) (quoting *United States v. Hyde*, 574 F.2d 856, 869 (5th Cir. 1978) (brackets in original)).

In *United States v. Perez*, the defendants challenged a wiretap where law enforcement had successfully used a confidential source, physical surveillance, toll records, cell site information, and pen registers.  661 F.3d at 581 n.19.  The Eleventh Circuit noted that, notwithstanding the successes that law enforcement had had with their traditional investigative techniques, the confidential source was not privy to important information within the criminal conspiracy that was under investigation.  The Court held that "[t]he partial success of alternative investigative measures, however, does not necessarily render electronic surveillance unnecessary."  *Id.* at 581–82.  In another recent case, *United States v. Goldstein*, ___F.3d___, 2021 WL 753429 (11th Cir. Feb. 26, 2021), the defendants argued that a wiretap was unnecessary because the Government had enough evidence for a conviction, having successfully obtained evidence through an SEC investigation, surveillance, phone records, and confidential sources.  *Id.* at *9.  The Eleventh Circuit disagreed, holding that "the Government's showing of necessity was not defeated based on the mere possibility that the Government might have otherwise had enough evidence to sustain a conviction against Defendants" because "the Government's stated objective . . . was to identify all the co-conspirators . . . and to determine the full scope of the conspiracy."  *Id.*

In this case, as in *Perez* and *Goldstein*, the Government successfully employed conventional investigative techniques to collect evidence, perhaps even enough to successfully prosecute its target subjects.[6]  In each of those cases, as in this one, the Government listed multiple objectives and targets for investigations in their Title III applications other than the four defendants charged in the indictment.  Law enforcement is permitted to apply for and use Title III intercepts to investigate conspirators beyond those whom it could prosecute at a given point during the investigation.  *See Perez*, 661 F.3d at 582 ("Even if the Government possessed sufficient evidence to prosecute [the defendant] prior to the wiretap, it had only limited knowledge of the full extent of his criminal activities and his coconspirators.").  Each of the necessity sections of the affidavits explained in great

---

[6] The Government does not concede that it had enough evidence to prosecute Defendants without the wiretap authorizations.  [Doc. 91 at 6–7].  The contemporaneous applications show that the Government could not confirm the Defendants' identities before the authorizations were approved.  In the First Application, for example, J. Villanueva and R. Villanueva were misidentified as "Jesus Acosta-Salcedo" and "Edgar Gonzalez," respectively.  [Doc. 92 at 2, 24].  In the Second Application, R. Villanueva is described as two different people, Edgar Gonzalez and J. Villanueva's brother.  [Doc. 92-2 at 2–3, 27–28].  Gant is identified only in the Third Application.  [Doc 92-4 at 3, 29].  This shows how the investigation was developing over time, which supports a conclusion that the wiretap authorizations were necessary to build a case against Defendants.  I note, however, as described in this Report & Recommendation, the Government need not show that non-wiretap evidence is insufficient against a particular defendant in order to satisfy the necessity requirement.

detail why certain techniques were not used, were not successful, or were too dangerous as required by 18 U.S.C. § 2518(1)(c).

Defendants Gant and Gonzalez complain that the Government applications contain "boilerplate language that is contained in virtually every application in narcotics investigations." [Doc. 80 at 5; Doc. 83 at 4]. Other judges in this district have found that the mere presence of "repetitive" or formulaic language within a Title III authorization application does not indicate an illegal "manufacture [of] necessity in all circumstances," as Defendants argue. [Doc. 80 at 5–6; Doc. 83 at 4–5]. *See, e.g., United States v. Montemayor*, No. 1:09-cr-551-LMM-JFK, 2018 WL 4517634, at *9 (N.D. Ga. Aug. 27, 2018) (upholding affidavits that provided specific reasons why traditional techniques "would not achieve the goals of the investigation.") (citing *United States v. Milton*, 153 F.3d 891, 895 (8th Cir. 1998)), *adopted by* 2018 WL 4517459 (N.D. Ga. Sept. 20, 2018); *United States v. Velazco*, No. 1:07-cr-412-CAP-GGB, 2008 WL 11383808, at *9 (N.D. Ga. Oct. 8, 2008) (upholding "repetitive" wiretap applications made during an ongoing investigation because they "contained information specific to the stage at which each was made."), *adopted by* 2008 WL 11383807 (N.D. Ga. Nov. 14, 2008); *United States v. Flores*, No. 1:05-cr-558-WSD-JFK, 2007 WL 2904109, at *29 (N.D. Ga. Sept. 27, 2007) ("[T]he affidavits are not merely boilerplate recitations . . . but include specific reasons why, given the events in the investigations being conducted to date,

traditional investigative techniques, although providing some success, would not achieve the goals of the investigation.) (citing *Milton*, 153 F.3d at 895). I agree with the reasoning of these cases.

Defendants argue that the TT#1 application was "nearly a carbon copy of a previous application for a different suspect, contained material omissions and statements regarding necessity." [Doc. 80 at 6; Doc. 83 at 4]. Defendants, however, cite neither a "previous application" nor the "material omission and statements" made, and I cannot identify any such issues in the Government's Title III application. J. Villanueva notes that "[t]he TT#2 and TT#3 applications also completely fail to mention that on September 25, 2019, pursuant to a court order, the agents had successfully deployed a cell-site simulator to ping Villanueva's telephone and discover his new phone number." [Doc. 86 at 11–12]. J. Villanueva does not cite a document or court order that explains this action, nor does he explain how such a development is material to the instant Title III authorizations.

For the reasons discussed above, I conclude that the Government's Title III wiretap authorization applications for TT#1, TT#2, and TT#3 showed that traditional methods of investigation had been used and failed or were reasonably likely to fail. As such, the Title III wiretap applications and authorizations were necessary under 18 U.S.C. § 2518, and Defendants' motions to suppress should be denied.

**B.    The Government had the statutory authority to apply for the wiretap orders.**

J. Villanueva also argues that the Government exceeded its authority when it presented the three applications to the district judges.  He does not challenge the identity of the DAAGs who signed the applications or the validity of their signatures.  Rather, he contends that the Attorney General's "blanket authorization" violated the statute, specifically pointing to the lack of an expiration date or identification of the designated officials by name.  [Doc. 86 at 5].

The resolution of this argument is governed by 18 U.S.C. § 2516(1), which provides that:

> The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division or National Security Division *specially designated by the Attorney General*, may authorize an application to a Federal judge [for] and order authorizing or approving the interception of wire or oral communications . . . .

18 U.S.C. § 2516(1) (emphasis added).  J. Villanueva complains that the Attorney General did not specially designate the approving deputy assistant attorneys general by name or limit their designation by time.

The purpose of this provision is to "centralize[] in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques.   Centralization will avoid the

21

possibility that divergent practices might develop.  Should abuses occur, the lines of responsibility lead to an identifiable person."  *United States v. Giordano*, 416 U.S. 505, 520 (1974).   Suppression of wiretap evidence is appropriate when an application was not properly authorized under § 2516(1).  *See id.* at 525–26; *United States v. Chavez*, 416 U.S. 562, 570 (1974).

Attached to each wiretap application in this case is an order dated March 25, 2019, signed by the United States Attorney General, William P. Barr.  [Doc. 92 at 20, Doc. 92-2 at 22, Doc. 92-4 at 19].   In that order, Attorney General Barr designated "any Deputy Assistant Attorney General of the Criminal Division, and any Acting Deputy Assistant Attorney General of the Criminal Division," among others similarly identified by job title, as empowered to authorize applications for wiretap orders.  [Doc. 92 at 20, Doc. 92-2 at 22, Doc. 92-4 at 19].  Also attached to each application is a memorandum purportedly authorizing the application, signed by a DAAG or an acting DAAG of the Criminal Division.[7]

J. Villanueva argues that Attorney General Barr's order specially designating the DAAG and acting DAAG to authorize wiretap applications is invalid.  [Doc. 86,

---

[7] Bruce C. Swartz, a DAAG of the Criminal Division at the relevant time authorized the first request via signature.  [Doc. 92 at 18–19].  Jennifer A. H. Hodge, and Acting DAAG of the Criminal Division at the relevant time, authorized the second request via signature.   [Doc. 92-2 at 20–21].   And Kevin O. Driscoll, a DAAG of the Criminal Division at the relevant time, authorized the third request via signature. [Doc. 92-4 at 21–22].

3–6].  He contends that, because the order specially designates job titles (rather than specifically identified individuals) in perpetuity, it effectively destroys the statutory distinction between the officials who do not require special designation (the Attorney General, Deputy Attorney General, and Associate Attorney General) and those who do require special designation (DAAGs and acting DAAGs).  In support of this argument, J. Villanueva relies on a Fourth Circuit case, *In re Total Realty Mgt., LLC*, 706 F.3d 245 (4th Cir. 2013).  [Doc. 86 at 6].  In response, the Government points to the Eleventh Circuit decision in *United States v. Messersmith*, 692 F.2d 1315 (11th Cir. 1982).  [Doc. 91 at 11].  Neither of these cases is on point.

In the absence of clear authority, I look to the plain language and purpose of the statute, 18 U.S.C. § 2516(1).  On its face, the statute does not regulate the procedure by which the Attorney General may specially designate approving officials, nor does it explicitly prohibit special designation by job title.  And, the special designation by job title does not frustrate the centralization of procedure discussed in *Giordano*.  There are six DAAGs in the Criminal Division.[8]  Each DAAG reports to the Assistant Attorney General, who is appointed by the President of the United States with the advice and consent of the Senate.  28 U.S.C. § 506.  The special designation of DAAGs and acting DAAGs by job title encourages

---

[8]  U.S. DEP'T OF JUSTICE, ORGANIZATIONAL CHART (July 24, 2019), https://www.justice.gov/criminal/sectionsoffices/chart.

"divergent practices" no more than the special designation of DAAGs by name.  The special designation of DAAGs and acting DAAGs by job title ensures that "[s]hould abuses occur, the lines of responsibility lead to an identifiable person." *Giordano*, 416 U.S. at 520.  In this case, the lines of responsibility travel through the identifiable DAAG or acting DAAG who signed the authorization to both the Acting Attorney General, who is responsible for the DAAG or acting DAAG, and to the Attorney General, who specially designated DAAGs and acting DAAGs by memorandum. Here, the lines of responsibility are clearly defined.

The Eleventh Circuit has not addressed the question of whether the Attorney General may specially designate approving officials by job title.  Other circuits, however, have directly addressed this issue in cases cited by the Government.  *See e.g., United States v. Pellicci*, 504 F.2d 1106, 1107 (1st Cir. 1974) ("[T]he designation of a single person accomplished by job title rather than by name does not run afoul of the legislative intent, recognized in *United States v. Giordano*, that the authority to approve applications be both narrowly confined and limited to those responsive to the political process.) (internal citation omitted); *United States v. Lambert*, 771 F.2d 83, 90 (6th Cir. 1985) ("The statute does not require . . . the designation of a specific individual to authorize wiretaps.  Rather, it is permissible for the Attorney General to designate a person by the office he or she holds.  This designation will then apply to whomever holds this office in the future."); *United*

*States v. Torres*, 908 F.2d 1417, 1421 (9th Cir. 1990) ("An Attorney General may 'specially designate' an officer pursuant to section 2516(1) by job title rather than name."). I find those opinions persuasive and reject Defendants' arguments to the contrary. J. Villanueva's motion to dismiss for lack of proper Title III authorization should be denied because the officials who authorized the wiretap applications were specially designated by the Attorney General in accordance with 18 U.S.C. 2516(1).[9]

## IV.    CONCLUSION

For the foregoing reasons, I **RECOMMEND** that Defendants' motions to suppress evidence related to the Title III wiretaps of J. Villanueva's phones [Docs. 80, 83, 86] be **DENIED.**

**IT IS SO RECOMMENDED**, this 30th day of March, 2021.


CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE

---

[9] The Government alternatively argues that even if there were something wrong with their applications, the motions to suppress should nevertheless be denied based on the good faith exception to the exclusionary rule articulated in *United States v. Leon*, 468 U.S. 897 (1984). [Doc. 91 at 12–13]. In his reply brief, J. Villanueva argues that the *Leon* good faith exception does not apply to statutory Title III exclusionary remedies. [Doc. 96 at 7–8]. Because I am recommending that the motion to suppress be denied on the merits, I have not reached this argument. If the district judge disagrees with my recommendations, the case can be submitted back to me, and I will promptly supplement this Report and Recommendation and address this alternative argument.